IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  07-CV-01297-BNB

MALACHI Z. YORK, also known as DWIGHT YORK,

     Plaintiff,

vs.

FEDERAL BUREAU OF PRISONS,

     Defendants.

---

### AMENDED COMPLAINT FOR INJUNCTIVE RELIEF

---

**COMES NOW** the Plaintiff, Malachi Z. York, Consul General Diplomat D/P #003828-04 of the Republic of Liberia, West Africa Citizenship, *misnomer* Dwight D. York (Inmate #17911-054) (hereinafter referred to as "Plaintiff"), by and through his attorneys, Holden Law Office, PLLC, and hereby files this civil action for injunctive and other appropriate relief, including an emergency medical transfer by Defendant Federal Bureau of Prisons (hereinafter referred to as "BOP").  Plaintiff complains and alleges as follows:

### I.    INTRODUCTION

1.    Plaintiff is a federal prisoner in custody of the United States Bureau of Prisons and is currently incarcerated at the United States Penitentiary, Administrative Maximum Facility (ADX), located in Florence, Colorado.

2.    On or about January 23, 2004, Plaintiff was convicted at trial for violations of the federal racketeering statutes, transporting minors in interstate commerce for the purposes of unlawful sexual activity and conspiracy to structure cash transactions to evade currency reporting

requirements, pursuant to 18 U.S.C. § 1962(c) and (d); 18 U.S.C. § 371; 18 U.S.C. §§ 3283, 2423(a); 31 U.S.C. §§ 5324(a)(3) and 5313(a), respectively.  Plaintiff was sentenced on April 22, 2004, to a term of incarceration of 1,620 months.

3.      On or about March 17, 2006, the Plaintiff was transferred to and is currently serving his sentence at ADX.  Plaintiff's inmate registration number 17911-054.

## II.      BACKGROUND

4.      That on April 27, 2006, Plaintiff filed a "Motion for Habeas Corpus Relief Pursuant to 28 U.S.C. §2241" (Dwight D. York v. United States of America, Case No. 06-cv-807 BNB).  The Honorable Magistrate Judge Boyd N. Boland entered an Order on May 12, 2006, construing the Habeas Corpus action as a civil rights action pursuant to Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).  This action was subsequently dismissed on June 21, 2006 for failure to prosecute.

5.      Plaintiff brought suit against the Federal BOP on June 20, 2007, by filing a "Prisoner's Complaint," pursuant to Bivens, 42 U.S.C. 1983 and U.S.C. §1331, seeking money damages and injunctive relief.  Following two preliminary rulings on July 6, 2007 and August 9, 2007, respectively, this Court granted Plaintiff an extension of time until November 7, 2007, to file an Amended Complaint.

6.      Since his arrest on May 8, 2002, Plaintiff has been transferred eleven times and detained in six different correctional facilities.  While awaiting trial from May of 2002 to January of 2004, Plaintiff was initially detained at the United States Penitentiary Atlanta in Atlanta, Georgia or "USP Atlanta" and, was subsequently transferred to the Clayton County Sheriff's Department (Georgia), the Putnam County Sheriff's Department (Georgia), twice to the Jones

2

County Sheriff's Department (Georgia) and the Metropolitan Correctional Center New York City (New York), not including the occasional "pit-stops" at the Federal Transfer Center Oklahoma City (Okalahoma). The multiple transfers during Plaintiff's 23-month pre-trial detention, which primarily consisted of solitary confinement, served no legitimate purpose other than "diesel therapy," which was highly disruptive and unnerving to Plaintiff.[1]

7.      Following Plaintiff's sentencing on April 22, 2004, he began serving his Federal term of imprisonment at the Jones County Sheriff's Department in Gray, Georgia, pending transfer to a Federal prison. Plaintiff did not begin serving his sentence within the Federal prison system until October of 2004, upon his transfer to the United States Penitentiary Leavenworth in Leavenworth, Kansas or "USP Leavenworth." Subsequently, Plaintiff was reclassified and transferred to a higher maximum security facility, in November of 2004[2] (United States Penitentiary Marion in Marion, Illinois or "USP Marion") and finally to a super-maximum facility,[3] in March of 2006 (ADX in Florence, Colorado), without adequate cause for each succeeding transfer.

8.      Plaintiff suffers from Acute Hereditary Angio-Neurotic Edema (HANE). Angioedema is the rapid swelling (edema) of the skin, mucosa and submucosal tissues. HANE

---

[1]     By placing Plaintiff in a constant state of motion, from one facility to another, he was effectively cut off from his family (e.g. could not receive mail due to the continuous movement and lack of a stable residence; denied telephone privileges; and suffered the hardship of constant worry from family members). Other factors of diesel therapy include housing in poor facilities – often county jails; housing with inmates outside of the inmate's security designation – including dangerous offenders; and being awakened at 3:00 a.m. to be put on the bus or plane for his/her next designation.

[2]     At the time Plaintiff was transferred to USP Marion in November of 2004, the facility was considered to be one of two super-maximum prisons in the Federal BOP, the other being ADX in Florence, Colorado. USP Marion downgraded to a medium-security facility in September of 2006 following Plaintiff's departure.

[3]     Super-maximum is a concept which began at USP Marion during 1983, and grew in popularity with California's Pelican Bay and Colorado's Florence; the facility generally houses the most violent of the violent, predatory types, escape risks, assaultive, disruptive, and with severe behavior problems.

3

(considered to be a form of angioedema where swelling may also occur in the digestive tract and other organs) is a rare, potentially fatal genetic disorder typified by a deficiency or dysfunction of the plasma protein C1 Inhibitor, and characterized clinically by swelling of the extremities, face, trunk, abdominal viscera, and upper airway. Severe swelling may occur over the period of minutes to several hours.

Angioedema commonly occurs on the lips, tongue, face, hands or feet. The swelling is pale and non-itchy, but can be accompanied by hives, with symptoms lasting for one or two days. If angioedema affecting the tongue or upper airway occurs rapidly, the patient may suffocate in a matter of minutes. In the gastrointestinal tract, angioedema can present as severe pain, which can be mistaken for appendicitis, mesenteric ischemia, or diverticulitis.

9.      Plaintiff hereby requests injunctive relief in the form of an Emergency Medical Transfer Remedy from ADX in Florence, Colorado. Plaintiff not only seeks an immediate medical transfer based on a rare hereditary genetic order but that his illness requires special medical attention that ADX is not able to facilitate. Plaintiff further requests relief in the form of a proper security level, custody level and medical classification, to be placed in his BOP records.

### III.      FIRST CAUSE OF ACTION
### (IMPROPER SECURITY AND CUSTODY CLASSIFICATION)

10.      Effective as of September 12, 2006, the designation of an inmate to a specific institution is governed by BOP Program Statement 5100.08 and is based on three factors, namely: (i) the level of security and supervision the inmate requires; (ii) the level of security and staff supervision the institution is able to provide and (iii) the inmate's program needs. BOP institutions are classified into one of five security levels: MINIMUM, LOW, MEDIUM, HIGH, and ADMINISTRATIVE based on the level of security and staff supervision the institution is

4

able to provide. Similarly, a custody level classification (i.e. COMMUNITY, OUT, IN and MAXIMUM) indicates the degree of staff supervision required for an individual inmate. Finally, BOP inmate classifications are also based on a prisoner's individual program needs, i.e., substance abuse, educational/vocational training, individual counseling, medical/mental health treatment, etc. Thus, an inmate will not only have a security and custody level classification, but also a medical needs classification, all of which are to be considered in determining a facility for service of sentence.

> When making designations, the BOP takes into account a number of factors, including type of offense, length of sentence, offender's age, offender's release residence, the need for medical or other special treatment and any placement recommendations made by the Court. The BOP relies primarily on the Pre-sentence Investigation Report prepared by the U.S. Probation Service, the Judgment and Commitment Order and the Statement of Reasons. See Rule 32(c)(1), Fed. R. Crim. P.

11. While it is understood that a male offender with more than 30 years remaining to serve will be housed in a high-security facility, it is unclear as to whether a Public Safety Factor (PSF) or Management Variable (MGTV), may have also effected Plaintiff's placement at USP Leavenworth, a high security level institution. Equally puzzling is whether Plaintiff's medical needs were properly considered as part of the **HIGH/IN** designation to USP Leavenworth, assigned on October 5, 2004. What is clear; however, is that a custody change to or from **MAXIMUM** custody must be justified thoroughly on the BP-338 Custody Classification Form and maintained *permanently* in the Inmate Central File. Despite the numerous requests made by Plaintiff, Defendant claims to have no records pertaining to Plaintiff's Custody Classification Form and/or Transfer Notice from USP Leavenworth to USP Marion, or from USP Marion to ADX Florence.

5

12.     Through the custody classification procedure, the BOP assigns an inmate "a level of supervision according to [his] criminal history and institutional behavior/adjustment. An inmate's custody level is an indication of how much staff supervision an inmate requires within and beyond the confines of the institution." Program Statement 5100.08, Inmate Security Designation and Custody Classification (9/12/2006), Ch. 6, p. 1. "The intent of the Custody Classification system is to permit staff to use professional judgment within specific guidelines." *Id.* Normally, a custody classification reflects the judgment of the BOP staff, and, therefore, is not subject to amendment.

13.     Despite the intent of the BOP classification system, Plaintiff asserts that his specific Inmate Security and Custody Classifications, related to the subsequent transfers to USP Marion and ADX, imposed "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). It is no secret that USP Marion (pre-2006) and ADX were specially designed for inmates with severe or chronic behavior patterns. Plaintiff asserts that the premeditated and wrongful transfer to USP Marion and ADX Florence, without the benefit of notice or the Warden's description of the reasons underlying the referrals, violated his right to due process under the Fourteenth Amendment.

14.     Plaintiff asserts that he possessed a liberty interest in remaining in general population at USP Leavenworth, based on his **HIGH/IN** security and custody level designation. It is worth recalling that Plaintiff was labeled a "model" inmate on the basis of his good conduct while incarcerated at USP Leavenworth. During his brief confinement as USP Leavenworth, Plaintiff did not have an incident disciplinary report, nor was it alleged that he violated institutional policies. The duration or conditions of Plaintiff's **ADMINISTRATIVE/MAXIMUM** confinement at USP Marion and ADX are abnormal when

6

compared to normal placement in general-population conditions at a high security institution, which truly represents typical prison life.[4]

15.    Contrary to the inmate (DeMont Connor) in Sandin, Plaintiff's transfer to USP Marion and ADX is tantamount to atypical and significant hardship. The principal difference, however, between Plaintiff and the Sandin inmate is that the duration and conditions of Mr. Conner's disciplinary confinement largely "mirrored" the duration of confinement and the conditions imposed upon other inmates in administrative confinement and protective custody within the *same* prison. In the instant case, the comparison of Plaintiff's remaining sentence of 133 years under harsher conditions, at a totally separate, super-maximum facility, located a distance of 625.46 miles (or approximately ten hours) away, does not mirror an administrative confinement for thirty days at the same high security institution, and is certainly not representative of typical prison life.

16.    In Gaines v. Stenseng, 292 F.3d 1222 (10th Cir. 2002), the court reversed and remanded a district court decision dismissing a prisoner's assertion of a liberty interest in avoiding a seventy-five-day sentence to disciplinary segregation. The Gaines court stated that the lower court erred by assuming, with little analysis, that seventy-five days in disciplinary

---

[4]    Webster's New World Dictionary defines "atypical" as "not characteristic; abnormal." If one accepts the argument that conditions in general population are, from an objective viewpoint, typical of the everyday prison existence, then placement in super-maximum confinement certainly meets the definition of atypical. Such placements resemble "prisons within a prison," with near-total solitary confinement, often times for twenty-three hours a day, while prisoners in general population are normally held in their cells from twelve to sixteen hours a day.

Prisoners in super-maximum confinement cannot work and have minimal access to educational opportunities or other privileges available to prisoners in general population at a high security institution. When allowed to leave their cells for bathing and exercise, super-maximum prisoners must be escorted by prison guards while handcuffed and shackled. In Sandin, Justice Breyer, in his dissent, noted that, absent Conner's disciplinary sentence, he, like the other general population prisoners, would have "left his cell and worked, taken classes, or mingled with others for eight *hours* each day." Instead, Conner found himself in a situation where he could leave his cell for fifty minutes each day and could talk to no one. Such a sentence surely marked a change that was uncharacteristic or abnormal when compared to what Conner experienced in general population.

7

confinement was an event typical of prison life. On remand, the circuit court not only instructed the district court to engage in an examination of the typical conditions of confinement in the plaintiff's prison, but also indicated that the responsibility for gathering such information should be shared by the state. Plaintiff requests that this Court conduct a similar analysis.

17.    Without an appropriate security and custody level classification, Plaintiff may never competently demonstrate his eligibility for medical treatment, further subjecting him to cruel and unusual punishment in violation of the Eighth Amendment.

18.    Plaintiff hereby requests a re-designation of his Inmate Security and Custody Classifications consistent with the stated requirements Program Statement 5100.08.

## IV.    SECOND CAUSE OF ACTION
## (MEDICAL TRANSFER)

19.    Title 18 U.S.C. § 3621 provides that the BOP shall designate where a prisoner will serve his or her sentence. The BOP retains exclusive discretion to assign and transfer prisoners to any of its facilities. See 28 C.F.R. Part 524 - Classification of Inmates; Program Statement 5100.08, Security Designation and Custody Classification Manual. See also McCarthy v. Doe, 146 F.3d 118 (2d Cir. 1998); Cohen v. United States, 151 F.3d 1338 (11th Cir. 1998); United States v. Pineyro, 112 F.3d 43 (2d Cir. 1997); Barden v. Keohane, 921 F.2d 476, 481-82 (3d Cir.1990). Furthermore, pursuant to 18 U.S.C. § 3625, the BOP's designation decision in any particular case is exempt from judicial review under the Administrative Procedures Act (APA) for an abuse of its discretion. See, e.g., Lyle v. Sivley, 805 F. Supp. 755 (D. Ariz. 1992). The Court's scope of review in such cases is limited to constitutional violations or instances where the BOP exceeded its agency authority. Id. Plaintiff believes that the BOP has exceeded such authority.

20.    The health care mission of the BOP is to provide necessary medical, dental and mental health services to inmates by professional staff in a manner consistent with community standards.  The principles "medically mandatory" and "presently medically necessary" are used to determine what health care is necessary.  "Medically mandatory" is defined as immediate, urgent, or emergency care required to maintain or treat life-threatening illness or injury.  "Presently medically necessary" is defined as routine care or treatment provided to maintain a chronic or non-life threatening condition that cannot be reasonably delayed without the risk of further complication, serious deterioration, significant pain or discomfort.  Determinations regarding what are medically mandatory or presently mandatory necessary are made by the health care professionals using their clinical judgment.  The Supreme Court held prison officials are prohibited under the Eighth Amendment from being deliberately indifferent to an inmate's serious medical needs.  See Estelle v. Gamble, 429 U.S. 97 (1976).

21.    BOP policy regarding medical care and procedure for caring for inmates with medical needs are set for the in 28 C.F.R. §549 and Program Statement 6000.05, Health Services Manual, which provides in part:

> Generally, inmates requiring specialized medical care are able to remain in regular institutions because many of them are equipped with special facilities and services and/or have augmented these services with contracts with community health care providers.  Inmates whose healthcare requirements exceed those services available in a typical institution can be transferred to one of the BOP'S medical referral centers, which are in Butner, North Carolina; Carswell Air Force Base, Texas; Devens, Massachusetts; Fort Worth, Texas, Lexington, Kentucky; Rochester, Minnesota and Springfield, Missouri; or to a community hospital, depending on the inmate's medical needs.

22.    Documentation of the BOP's knowledge of Plaintiff's medical condition dates back to 2002.  Immediately following Plaintiff's arrest, the BOP and Justice Department were put on notice by the Plaintiff's private physician as to the severity of his medical condition (see

9

**Exhibit 1,** Affidavit of William S. Thompson, M.D. dated October 18, 2002). A brief summary

of the attempts made by Plaintiff's private physician to alert prison officials at USP Atlanta as to

his medical condition and the deterioration of his health, follow below:

> a.    On May 8, 2002, Dr. Thompson informed the U.S. Marshal Service that Plaintiff suffers from a life-threatening illness that is triggered by emotional stress and mental trauma;

> b.    On or about May 11, 2002, pursuant to the request of the Medical Director of U.S. Prison Health Services, Dr. Thompson submitted a Summary of Medical Care[5] to Dr. Ivan Negrone (see **Exhibit 2**). He subsequently received confirmation of receipt of the summary from Dr. Ramone, the Clinical Director.

> c.    Plaintiff's family members notified Dr. Thompson that Plaintiff had suffered at least two attacks of HANE, with tightening of his throat and near-asphyxiation, between May 12, 2002 and May 20, 2002. Dr. Thompson contacted the prison doctors and pharmacists at USP Atlanta to inform them of Plaintiff's medication needs;

> d.    From May 2002 through June 2002, Dr. Thompson contacted Latease Bailey, of the prison legal department requesting information on Plaintiff's condition. Dr. Thompson contacted Mr. Raiez, the Health Administrator in an attempt to explain the seriousness of Plaintiff's medical condition, in July of 2002; and

> e.    During the months of July, August and September 2002, Plaintiff's family members notified Dr. Thompson that Plaintiff's HANE attacks had become more frequent. This was confirmed by written correspondence from Plaintiff or October 4, 2002.

23.    In a letter dated September 10, 2003, the Regional Director of the Federal BOP

Southeast Regional Office, acknowledged Plaintiff's medical condition and the treatment he

received while housed at USP Atlanta, detailed as follows:

---

[5]    Dr. Thompson noted on the medical records the expiration time of Plaintiff when these attacks occur is three to five minutes. The nearest (cardio or otherwise) medical facility capable of assisting Plaintiff in an emergency is Parkview Medical Center which is an hour or more away. Plaintiff was never given a follow-up treatment by the prison medical administration. Dr. Thompson's seven year progress report noted attacks approximately twice a year and seldom symptoms of hives and facial or body swelling. Attacks now have increased to numerous attacks within months, and constant facial and body swelling.

10

> A review of [their] records revealed Mr. York was housed at USP Atlanta on "holdover" status intermittently since 2002. Upon his arrival, Mr. York received appropriate medical treatment. In accordance with policy, he has received quarterly medical evaluations in the Chronic Care Clinic to monitor his pre-existing medical diagnosis of Childhood Asthma and Acquired Angio-Edema, Mr. York was evaluated and treated. Additionally, he was evaluated and treated....
> (BOP letter dated September 10, 2003, attached hereto as **Exhibit 3**).

24.    Plaintiff's medical condition is also clearly reflected in his Pre-sentence

Investigation Report ("PSR") dated February 18, 2004, amended. Specifically, the PSR notes

A review of [their] records revealed Mr. York was housed at USP Atlanta on "holdover" status intermittently since 2002. Upon his arrival, Mr. York received appropriate medical treatment. In accordance with policy, he has received quarterly medical evaluations in the Chronic Care Clinic to monitor his pre-existing medical diagnosis of Childhood Asthma and Acquired Angio-Edema, Mr. York was evaluated and treated. Additionally, he was evaluated and treated....

(BOP letter dated September 10, 2003, attached hereto as **Exhibit 3**).

24. Plaintiff's medical condition is also clearly reflected in his Pre-sentence Investigation Report ("PSR") dated February 18, 2004, amended. Specifically, the PSR notes that "[s]ince 1997, the [Plaintiff] has been treated by the Family Practice of Monticello. Records obtained from this practice reflect that the [Plaintiff] suffered episodes of swelling and edema of his mouth and throat during February/March of 2002. As reported by the [Plaintiff] and confirmed by his physician, one of those incidents resulted in the asphyxiation of the [Plaintiff] requiring resuscitation... In the past the [Plaintiff] has been treated with the following medications: Epinephrine, Diphenhydramine, Zyrtec, Hydroxyzine, Danocrine, Methyltestoster-one, and Prednisone." See PSI, ¶232, pp.41-42. (**Exhibit 4**).

25. Inmates are obligated to attempt informal resolution of grievances prior to filing a formal request for administrative remedy. See 28 C.F.R. §542.13.

Once a formal request is filed at the institution level, the warden of that facility has 20 days to investigate and provide the inmate a written response. See 28 C.F.R. §542.18. If the inmate is not satisfied with the warden's response, he or she has 20 days to file a Regional Administrate Remedy Appeal. See 28 C.F.R. 542.15. Once received in the regional office, the regional director has 30 days to investigate and provide a written response. Id. If the inmate is not satisfied with the regional director's response, he or she has 30 days to file a Central Office Administrative Remedy Appeal. Once received in the Central Office, the Administrator has 40 days to investigate and provide the inmate a written response. After receiving the Administrator's response, the inmate has exhausted the BOP's Administrative Remedy Program.

26.    On December 4, 2005, while incarcerated at USP Marion, Plaintiff filed an informal resolution requesting a "transfer to a prison in BOP to receive proper healthcare for my Angioedema a serious and life threatening ailment." The Counselor denied Plaintiff's request on December 16, 2005, stating that Marion is able to handle his sickness.  In his request for Administrative Remedy dated December 21, 2005, Plaintiff advised that he never received medication from them.  Subsequently, on January 25, 2006, the Warden responded as follows:

> Your medical records indicate on December 2, 2005, you refused to have blood drawn and evaluated for angioedema.  Your records also indicate that your family has a history of angioedema.  However, you have never been diagnosed with this while incarcerated in the Bureau of Prisons.

USP Marion never denied its failure to administer medication to Plaintiff.  The stated reason for not providing medication to Plaintiff is that he refused to submit to a blood sample.  Warden Bledsoe noted the history of Angioedema but did not acknowledge it because it was not diagnosed by the BOP.

27.    Plaintiff maintains that there should have been no reason to doubt the legitimacy nor severity of his medical condition as it has been documented by more than one Federal facility.  Prison medical records follow an inmate through each stage of his travels from one facility to the next.  Any medical occurrences regarding HANE should have been documented on Plaintiff's medical records.  If the medical records were properly documented, but not acknowledged by BOP personnel, their failure to act constitutes deliberate indifference.  If the medical records were not documented, then the omission of HANE constitutes a level of negligence indistinguishable from cruel and unusual punishment.

28.    The BOP has demonstrated manifested deliberate indifference by delaying or denying access to Plaintiff proper medical and dental care, in violation of the Eighth

Amendment. In addition, the highly stressful environment of ADX Florence caters to the conditions that agitate these life- threatening episodes. Plaintiff's condition is such that it requires close monitoring at all times, given that the occurrence of a HANE attack can occur at any time of day or evening, when staffing is either absent or limited.

29. Evidence of the BOP's inability to aid to the needs of Plaintiff's medical condition, specific to ADX Florence follows below:

a. Plaintiff's most acute attack occurred on March 27, 2007, at approximately 3:00 a.m. He was evacuated on an emergency basis to Parkview Medical Center, in Pueblo, Colorado, which is located nearly an hour away from ADX Florence (a distance of approximately 45 miles). The severity was such that Plaintiff nearly asphyxiated due to airway obstruction caused by the acute swelling of the skin of the face, and the mucosa of the mouth and/or throat, as well as the tongue. The emergency room report dated March 27, 2007, from Parkview Medical Center, detailing Plaintiff's past medical history, clearly notes "angioedema," yet Plaintiff was prescribed medication for ).

When Plaintiff arrived at Parkview Medical Center, it was recommended by the medical staff for him to stay overnight for further observation. However, Plaintiff affirms his stay was shortened due to the lack of bed availability and/or deliberate indifference to an inmate from ADX. Such was the case with Plaintiff after he received medical care. Medical discharge notes from the dictating physician: Joslin, Carol J., states the following:

> [P]atient presents with chest pain. Differential diagnoses of chest pain would include cardiology etiology, gastrointestinal, pulmonary and musculoskeletal... I contacted Dr. George Gibson, our cardiologist on call, who felt that since the patient does come from Super-Max, a prison facility it would be best if we could send him home after having the stress test... the case was discussed with the prison MD over the phone.

So Dr. Gibson's medical decision on dismissal was not based on the overall medical performance of Plaintiff, but on where he came from.

b. After a life-threatening HANE attack on August 23, 2007, at 6 a.m., Plaintiff awoke with facial deformities around the mouth (lips, tongue and throat swelling) and hives on the arms, wrist and stomach. A Physician Assistant did not arrive to his cell until 11:17 a.m., whereby Plaintiff laid in distress for approximately 6 hours before someone came to his aid. The medical professional P.A within ADX Florence instructions were as follows: take one Zantac (Ranitidine) twice daily 150 mg. by mouth (not dissolved in a full 6-8 oz. glass of water).

13

Warnings on the Zantac prescription indicates if you experience any of the allergic reactions. To stop using ranitidine and get emergency medical help if you have any of these signs of allergic reaction: hives, facial swelling including the lips, tongue or throat, breathing difficulty, all of which Plaintiff experiences with HANE. Plaintiff was not sent for emergency care on August 23, 2007, as urged by the warning label, if an allergic reaction was experienced. He was not given professional care for his chronic condition. Neither was an appropriate use of his medical history and physical findings used to formulate a differential diagnoses.

30.    When inmates care exceeds those able to be facilitated in ADX Bureau of Prisons they are transported to Parkview Medical Center located in Pueblo Colorado. The sheer distance from the nearest medical facility clearly demonstrates the inability of ADX to provide proper medical attention to Plaintiff. Furthermore, none of Plaintiff's medical records were reviewed, which is mandatory for all qualified, licensed practitioners prior to issuing any medication to a patient. This includes failure of a medical practitioner to document the issuance of all medication and occurrences experienced by a patient. Within a hospital or penitentiary the professional standards expected of a P.A. should not be compromised.

31.    Since March of 2007, Plaintiff continues to suffer attacks multiple times per week, becoming more frequent and longer in duration with each episode. His most recent attacks, as documented by the Physician Assistant at ADX, occurred on July 27, August 3 and August 23, 2007. If not properly treated, respiratory arrest or suffocation is likely to occur, with the certainty of death due to the distance from the nearest medical facility.

32.    Family members are frequently not made aware of Plaintiff's severe attacks until they arrive at a visit, which could be a week or two later. There are no calls made or letters sent in respect to Plaintiff's condition. As of the date of this Complaint, Plaintiff does not have, nor has he ever been provided a patient care plan, which is essential to the livelihood and healing process of any patient. In July of 2007, an administrator over the medical department at ADX

14

Florence stated during a telephone call with Plaintiff's legal assistants and Dr. Bright *that he did not even know Mr. York had Angioedema.* When asked whether an inmate's medical records travel with them from facility to facility he responded "*YES.*" Again, demonstrating beyond a doubt that ADX Florence is not capable of handling even the bare necessities concerning Plaintiff's medical condition. Nor is the ability to treat Mr. York for his severe case of HANE satisfied by the medical team in Florence. This evident abuse of professional medical standards could have caused Plaintiff his life, alongside the time frame they lacked in arriving to the aid of Plaintiff.

33.    Now, over seven months later, no follow-up visits to the treating physician in Parkview Medical Center ever took place. Nor were any patient care plans adapted from professional care. These episodes have become even more severe and repetitive. Lacking proper medical attention by a licensed physician, available on the premises of Florence during the past year could have resulted in numerous damaging possibilities in the course of Plaintiff's medical treatment.

34.    "Deliberate indifference" by prison personnel to an inmates serious illness or injury constitutes cruel and unusual punishment under the Eighth Amendment and whether indifference consists of prison doctors in their response to prisoners needs or guards in denying or delaying access to treatment or interfering with prescribed treatment, the inmate's constitutional rights are violated.

35.    There is no reason to doubt the severity of Plaintiff's condition as it has been indicated in more than one Institution. During the course of Plaintiffs incarceration medical record assessments demonstrated a continued downfall of the plaintiff's health. With a dramatic

change of climatic weather, harsh conditions, lack of knowledge about angioedema by prison medical professionals, Plaintiff continues to suffer numerous and continued HANE attacks.

36.    In addition to these facts, Plaintiff has sought dental and vision care as well. He suffered with a taunting tooth ache. As it is no secret a decayed or poor dental hygiene can create a stressful situation for anyone in need of urgent medical care. In July of 2007, a medical doctor at ADX was contacted by two legal assistants and a private medical doctor in regards to what relief or remedy can be sought for the Plaintiff. They were told by the ADX doctor, had to get on a list (which he has already placed on). However, the inmates have a long waiting list. The ADX doctor stated that inmates were taken in accordance with the list; therefore, Plaintiff had to continue under more medical duress. To date, Plaintiff has not had any relief.

37.    Since arriving at ADX, Plaintiff has been prescribed the drug Ranitidine on at least two separate occasions: March 28, 2007 and August 23, 2007, which is used to treat and prevent ulcers in the stomach and intestines. It also treats conditions in which the stomach produces too much acid, such as Zollinger-Ellison syndrome, gastroesophageal reflux disease (GERD) and other conditions in which acid backs up from the stomach into the esophagus, causing heartburn. Warning labels associated with Ranitidine clearly instruct patients to "[s]top using ranitidine and get emergency medical help if you have any of these signs of an allergic reaction: 'hives; difficulty breathing; swelling of your face, lips, tongue, or throat,'" which are the very symptoms for which Plaintiff seeks relief from, thus, camouflaging the manifestations of HANE.

38.    Plaintiff has consistently presented to ADX personnel complaints of swelling of the face, extremities, and other similar symptoms; and he has variously reported the symptoms to

16

be weekly in frequency (from July to September 2007, for example) and once every few months (in March 2007, for example), the reported frequency usually related to the various stressors experienced by Plaintiff at the time, including excessive disciplinary measures taken against him.

39.     Deliberate indifference to the medical needs of an inmate constitutes the "unnecessary and wanton infliction of pain." Gregg v. Georgia, 173, 96 S. Ct., at 2925 (joint opinion), proscribed by the Eighth Amendment to the United States Constitution. Plaintiff's lack of reasonable and proper medical attention may be tantamount to deliberate indifference to his medical needs, thereby subjecting him to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The Supreme Court held prison officials are prohibited under the Eighth Amendment from being deliberately indifferent to an inmate's serious medical needs. See Estelle v. Gamble, 429 U.S. 97 (1976).

## IV.     SECOND CAUSE OF ACTION (DENIAL OF STEP-DOWN PROGRAM)

40.     While incarcerated in ADX, Plaintiff participated in an educational program, which should have allowed for a decreased classification level. Plaintiff successfully completed such program, as an excellent student. Indicating no signs of violent behavior or otherwise. At no time while incarcerated at ADX, has there been any evidence Plaintiff that has demonstrated violent behavior. In accordance with the rules of ADX Florence each inmate is privileged to review for lower classification every six months. As such, Plaintiff has been incarcerated for more almost two years at ADX and not received such relief. Plaintiff seeks immediate relief.

## IV. THIRD CAUSE OF ACTION (TRANSFER NEAR RELEASE RESIDENCE)

41.    Plaintiff asserts that the Defendant under the authority of the Justice Department has transferred him 1,500 miles from his family who are located in Athens, Georgia, in violation of Plaintiff's civil rights.  According to the BOP's policy on inmate jurisdiction, inmates should be place an individual in the least restrictive facility for which he or she qualifies within 500 miles of a release residence. Release residence is defined as the defendant's legal address listed on the PSI.

42.    This extreme distance has caused much and medical and mental stress on Plaintiff, and the same for his family.  Including financial difficulty, who are forced to exceed their budget by thousands of dollars per month in the keeping of visits with their loved one. Thereby Plaintiff requests expedient injunctive relief from such harsh conditions.

## V.    REQUESTED RELIEF

Plaintiff requests:

1.    An Order that Defendant immediately and expeditiously redesignate Plaintiff's security and custody level classification, to include a Plaintiff's medical needs;

2.    An Order that Defendant approves Plaintiff's medical transfer to the Federal Medical Center in Butner, North Carolina to receive proper medical treatment and further compliance with a transfer near release residence;

3.    That Plaintiff recover the costs of this action, including reasonable attorney's fees;

4.    That Plaintiff receive such other and further relief as the case requires and the Court deems proper; and

**RESPECTFULLY SUBMITTED** this __7__ day of November, 2007.


By: ___/s/ Leta R. Holden_____
  Leta R. Holden, Esq.
  Holden Law Office, PLLC
  1330 Leyden Street, Suite 145
  Denver, Colorado 80220
  Telephone: (303) 321-1993
  Facsimile: (303) 321-0793
  E-mail: lholden@holdenlaw.org

  Attorney for Plaintiff, Malachi Z. York, Consul General Diplomat D/P #003828-04 of the Republic of Liberia, West Africa Citizenship, *misnomer* Dwight D. York (Inmate #17911-054)

## CERTIFICATE OF MAILING

I hereby certify that on this __7__ day of November, 2007, a true and correct copy of the foregoing **AMENDED COMPLAINT FOR INJUNCTIVE RELIEF** was filed via the CM/ECF system, which will send notification of such filing to the following email addresses:

**lholden@holdenlaw.org**

**ka-ramos@holdenlaw.org,**

and I hereby certify that the foregoing was placed in the U.S. mail, first-class postage prepaid and addressed to following non CM/ECF participants :

Malachi Z. York
a/k/a Dwight York
Reg. No. 17911-054
ADX – Florence
P.O. Box 8500
Florence, Colorado 81226
Plaintiff


By: ___/s/ Leta R. Holden_____
  Leta R. Holden, Esq.
  Holden Law Office, PLLC
  1330 Leyden Street, Suite 145
  Denver, Colorado 80220
  Telephone: (303) 321-1993
  Facsimile: (303) 321-0793
  E-mail: lholden@holdenlaw.org

19